UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                      )
UBS FINANCIAL SERVICES INC.,          )
UBS FINANCIAL SERVICES                )
INCORPORATED OF PUERTO RICO, and      )
UBS TRUST COMPANY OF PUERTO RICO,     )
                    Petitioners,      )
                                      )
        v.                            )      CIVIL ACTION
                                      )      NO. 16-02017-WGY
ASOCIACIÓN DE EMPLEADOS DEL ESTADO    )
LIBRE ASOCIADO DE PUERTO RICO         )
                    Respondent.       )
                                      )
```

```
                                      )
ASOCIACIÓN DE EMPLEADOS DEL ESTADO    )
LIBRE ASOCIADO DE PUERTO RICO         )
            Plaintiff,                )
                                      )
        v.                            )      CIVIL ACTION
                                      )      NO. 16-02237-WGY
UBS FINANCIAL SERVICES INC.,          )
UBS FINANCIAL SERVICES                )
INCORPORATED OF PUERTO RICO, and      )
UBS TRUST COMPANY OF PUERTO RICO,     )
            Defendants.               )
                                      )
```

YOUNG, D.J.[1]                                 December 20, 2019

## MEMORANDUM OF DECISION

## I. INTRODUCTION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq.,
provides that arbitration awards are not to be undone by

---

[1] Of the District of Massachusetts sitting by designation.

judicial review save for narrow grounds such as evident partiality, arbitrator corruption, or arbitrator misbehavior. 9 U.S.C. § 10(a). Before the Court are two consolidated actions which were brought to determine whether an arbitration award should be confirmed or vacated. While the procedural history of these actions is somewhat complicated because the arbitration award was confirmed in one action while the petition to vacate the arbitration award was pending in the other, the actions are now consolidated before this Court. The heart of this matter, on the merits, is whether two of the three arbitrators were evidently partial or guilty of misbehavior that prejudiced the rights of the losing party. As this Court ruled at the hearing on October 18, 2019, the motion to vacate the arbitration award was denied on the merits of those charges, the motion for judgment on the pleadings was denied as moot, and the motion for relief from judgment or for altering or amending the judgment was denied. This opinion explains those rulings.

## II. BACKGROUND

On June 3, 2016, UBS Financial Services, Inc., UBS Financial Services Incorporated of Puerto Rico, and UBS Trust Company of Puerto Rico (collectively "the UBS Parties") brought an action to confirm an arbitration award styled <u>UBS Financial Services, Inc. et al.</u> v. <u>Asociacion de Empleados del Estado Libre Asociado de Puerto Rico</u>, Civ. No. 3:16-CV-02017 (the

"Confirmation Action"). Pet. Confirm Arbitration Award ("Pet. Confirm"), Confirmation Action, ECF No. 1.[2]

On June 22, 2016, AEELA initiated a separate action in the Puerto Rico Court of First Instance, San Juan Superior Court, seeking to vacate the award claiming arbitrator partiality and misconduct. On June 30, 2016, the UBS Parties removed the case to this Court, styled Asociación de Empleados del Estado Libre Asociado de Puerto Rico v. UBS Financial Services, Inc. et al., Civ. No. 3:16-CV-02237 (the "Vacatur Action"). Notice Removal, Vacatur Action, ECF No 3.

After missing two deadlines to respond to the petition in the Confirmation Action, Judge Gelpí[3] allowed AEELA's request to docket a proposed "Answer" late and denied a motion to

---

[2] On April 22, 2014, Asociación Empleados del Estado Libre Asociado de Puerto Rico ("AEELA") initiated an arbitration proceeding against the UBS Parties, styled Asociación de Empleados del Estado Libre Asociado de Puerto Rico v. UBS Fin. Servs. Inc., UBS Fin. Servs. Inc. of Puerto Rico, and UBS Trust Company of Puerto Rico, FINRA Case Number 14-01256 ("the Arbitration"). Confirmation Action, Pet. 1, ¶8. On May 23, 2016, after 10 days of hearings, 12 witnesses, and 500 exhibits the arbitration panel entered an arbitration award ("the Arbitration Award") denying AEELA's claims, request for punitive damages, and request for attorneys' fees. Id. ¶ 12, Pet. Confirm, Ex. A, Arbitration Award, Confirmation Action, ECF No. 1-1. AEELA does not challenge the merits of the award in this action.
[3] At all times relevant to his participation in the Confirmation Action, now-Chief Judge Gelpí was not the Chief Judge. Accordingly, he is referred as Judge Gelpí to reflect his proper title relative to his participation in the Confirmation Action.

consolidate the Vacatur Action. March 28, 2017 Electronic Orders, Confirmation Action, ECF Nos. 43 and 44. Judge Gelpí then confirmed the arbitration award and entered judgment because, among other things, AEELA failed to submit any evidence of bias or misconduct. Op. & Order, Confirmation Action, ECF No. 46; J., Confirmation Action, ECF No. 47.

On April 21, 2017, AEELA filed a motion to vacate the judgment under Rule 59 or 60, which UBS Parties opposed on May 5, 2017. Resp't's Mot. Relief J. Altering Amending J. Federal Rules Civil Procedure 59 & 60 Confirmation Action, ECF No. 48; Pet'r's Resp. Resp't's Mot. Relief J. Altering Amending J. Federal Rules Civil Procedure 59 & 60, Confirmation Action, ECF No. 60.

On April 28, 2017, AEELA moved for Judge Gelpí's disqualification on the grounds that Judge Gelpí's father had appeared as counsel in two of the underlying arbitration hearings. Mot. Recusal, Confirmation Action, ECF No. 51. The UBS Parties opposed the motion. Pet'r's Resp. Resp't's Mot. Recusal, Confirmation Action, ECF No. 53. Judge Gelpí denied the motion, but referred the matter to then-Chief Judge Aida Delgado-Colon for reassignment to another judge to consider the motion for reconsideration. Order, Confirmation Action, ECF No. 57. The case was randomly re-assigned to Judge Daniel R. Dominguez, who recused himself the next day. Confirmation

Action, ECF Nos. 62 and 63.  On May 11, 2017, this action was randomly re-assigned to this Court.  Confirmation Action, ECF No. 64.

After the Confirmation Action was reassigned, this Court held a video conference motion hearing.  The Court questioned whether there was any impediment for the Vacatur Action to proceed on the merits.  Mot. Hr'g Tr. 4, Confirmation Action, ECF No. 83.  The UBS Parties argued that because the arbitration award had been confirmed in the Confirmation Action, the pending motion for judgment on the pleadings in the Vacatur Action made it unnecessary to determine the merits of the Vacatur action.  Id.  The Court took a different approach:

> THE COURT: Well, let me put this to you. I am not disposed to allow things to remain in that posture . . . [AEELA's] motion . . . raises very serious issues which are -- or I would like to see them before one of my colleagues.  So what I propose to do here is to take their motion to vacate the judgment in this case under advisement.  We've got sort of a chicken-and-egg problem here, because if Judge Delgado were to vacate the award [in the Vacatur Action], then the motion to vacate the judgment, which is before me, . . . would have far more merit. On the other hand, if [Judge Delgado] does not vacate the award [in the Vacatur Action], then there does seem to me -- and I say this with respect, Mr. San-Juan, very little merit to this motion and I ought to deny it. But I would be loathe to have the entry of a judgment confirming an arbitration award used as a bar to addressing the merits at some stage.
> Now, Mr. MacDonald [UBS Parties' counsel], I take it you're okay with that if I take this motion under advisement, . . . close this case administratively, and it can be opened at any -- by any party once Judge Delgado has ruled, how does that suit you?

Id. at 4-5.  The UBS Parties objected to waiting for Judge Delgado to determine the matter on the merits, but in the alternative suggested that the Court might consolidate the matters and dispose of the entire matter.  Id. at 6.  AEELA had no objection to consolidation.  Id. at 7.

On June 8, 2017, the parties jointly moved to reconsider a renewed motion to consolidate Vacatur Action with the case before this Court.  Joint Mot. Recons. Renewed Mot. Consolidate Related Cases, Confirmation Action, ECF No. 74.

On June 9, 2017, the Court granted the motion for reconsideration of consolidation, Order Mot. Recons., Confirmation Action, ECF No. 75, and the Vacatur Action was reassigned to this Court on June 19, 2019, with the consent of Judge Delgado.  Mem. Clerk, Vacatur Action, ECF No. 53.

Thus, there came before the Court the following motions and related submissions:

1.   AEELA's Motion to Vacate the Arbitration Award ("Motion to Vacate the Arbitration Award"), in the form of a supplemental brief ("AEELA's Suppl. Br.") AEELA's Suppl. Br., Confirmation Action, ECF No. 79-1, along with UBS Parties' Response, Resp. AEELA's Suppl. Br. ("UBS Suppl. Br."), ECF No. 95 and AEELA's Reply, AEELA's Reply UBS Resp. Suppl. Br. ("AEELA Reply Suppl. Br."), Confirmation Action, ECF No. 97;

2.   AEELA's Motion for Relief from Judgment and/or for altering or amending the judgment pursuant to Federal Rules for Civil Procedure 59 and 60 ("Motion for Relief from Judgment"), Resp't's Mot. Relief J. Altering Amending J. Federal Rules Civil Procedure 59 & 60 Confirmation Action, ECF No. 48, along with UBS

Parties' Opposition, Pet'r's Resp. Resp't's Mot.
Relief J. Altering Amending J. Federal Rules Civil
Procedure 59 & 60, Confirmation Action, ECF No. 60,
and AEELA's Reply, Resp't's Reply Respon't's Pet'r's
Resp. Resp't's Mot. Relief J. Altering Amending J.
Federal Rules Civil Procedure 59 & 60, Confirmation
Action, ECF No. 66; and

3.   UBS Parties' Motion for Judgment on the Pleadings,
     Resp't's Mot. & Incorporated Mem. Law J. Pleadings
     Federal Rule of Civil Procedure 12(c) ("Motion for
     Judgment on the Pleadings"), Vacatur Action, ECF No.
     41, along with AEELA's Opposition, Pet'r's Opp'n
     Resp't's Mot. J. Pleadings Federal Rule of Civil
     Procedure 12(c), Vacatur Action, ECF No. 42, UBS
     Parties' Reply, Resp't's Reply Supp. Mot. J. Pleadings
     Federal Rule of Civil Procedure 12(c), Vacatur Action,
     ECF No. 44, and AEELA's Surreply, Pet'r's Surreply
     Resp't's Mot. J. Pleadings Federal Rule of Civil
     Procedure 12(c), Vacatur Action, ECF No. 51.

## III.   ANALYSIS

This Court takes AEELA's allegations of arbitrator evident
partiality and misbehavior very seriously, but AEELA fails to
meet its burden to establish evident partiality or misbehavior
warranting this Court's vacating the award.  Alternatively,
AEELA waived at least some of its challenges.  Accordingly, the
Motion to Vacate the Arbitration Award was denied.  As a result,
the Motion for Relief from Judgment in the Confirmation Action
was denied, and the Motion for Judgment on the Pleadings in the
Vacatur Action was denied as moot.

**A.    MOTION FOR VACATUR OF ARBITRATION AWARD**

**1.    Review of Arbitration Awards Under the FAA.**

Under the FAA, "[j]udicial review of an arbitral award is 'extremely narrow and exceedingly deferential.'" Ameriprise Fin. Servs., Inc. v. Brady, 325 F. Supp. 3d 219, 224 (D. Mass. 2018) (Woodlock, J.) (quoting National Cas. Co. v. First State Ins. Grp., 430 F.3d 492, 496 (1st. Cir. 2005)). "This form of judicial review is 'among the narrowest known in the law.'" Id. (quoting Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 123 (1st Cir. 2008)). Relevant here, under the FAA, "'a court may vacate an arbitral award where: . . . there was evidence of partiality or corruption in the arbitrators, or either of them; [or](3) the arbitrators were guilty of misconduct . . . any other misbehavior by which the rights of any party have been prejudiced . . . .'" Axia NetMedia Corp. v. Massachusetts Tech. Park Corp., 381 F. Supp. 3d 128, 134 (D. Mass. 2019) (Hillman, J.) (citing 9 U.S.C. § 10(a)).

**2.    Evident Partiality**

Four decades after the Supreme Court's plurality opinion in Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145 (1968), the Circuits are still split concerning the interpretation of "evident partiality." In Commonwealth Coatings Corp., a subcontractor sued the sureties on the prime contractor bond to recover money allegedly due under a painting

job.  Id. at 146.  The contract required the parties submit to
arbitration.  Id.  The arbitration panel consisted of three
arbitrators.  Id.  Each side chose one arbitrator, and the
parties jointly picked a third.  Id.  The third arbitrator had a
substantial business relationship with the prime contractor in
the underlying arbitration.  Id.  Although "sporadic, . . . .
the prime contractor's patronage was repeated and significant,
involving fees of about $12,000 over a period of four of five
years, and the relationship even went so far as to include the
rendering of services on the very projects involved in this
lawsuit."  Id.  These facts were never revealed by the
arbitrator, and unknown by the subcontractor until after the
award.  Id.

The United States District Court for the District of
Massachusetts denied the subcontractor's motion to vacate the
award.  Id.  The First Circuit affirmed the district court.  Id.

In reversing the First Circuit, Justice Black wrote for a
plurality of the Supreme Court, first acknowledging that there
were no allegations of "fraud," "actual bias," or "improper
motives."  Id. at 147.  Yet he also noted that "neither this
arbitrator nor the prime contractor gave to [the subcontractor]
even an intimation of the close financial relations that had
existed between them for a period of years."  Id. at 147-148.
Justice Black analogized that "if a litigant could show that a

foreman of a jury or a judge in a court of justice had, unknown

to the litigant, any such relationship, the judgment would be

subject to challenge." Id. at 148. The Supreme Court cited

Tumey v. State of Ohio, 273 U.S. 510 (1927), where it held that

a conviction could not stand where the judge's compensation

consisted of court fees derived from convicted defendants. Id.

Upon the facts of record in Commonwealth Coatings, a plurality

of the Supreme Court held that disclosure was required:

> It is true that arbitrators cannot sever all their
> ties with the business world, since they are not
> expected to get all their income from their work
> deciding cases, but we should, if anything, be even
> more scrupulous to safeguard the impartiality of
> arbitrators than judges, since the former have
> completely free rein to decide the law as well as
> the facts and are not subject to appellate review.
> We can perceive no way in which the effectiveness
> of the arbitration process will be hampered by the
> simple requirement that arbitrators disclose to the
> parties any dealings that might create an
> impression of possible bias.

393 U.S. at 148-149 (emphasis added). The plurality then

referred to rules of the American Arbitration Association

and Canons of Judicial ethics, that while "not controlling"

are instructive inasmuch as they:

> . . . rest on the premise that any tribunal
> permitted by law to try cases and controversies not
> only must be unbiased but also must avoid even the
> appearance of bias. We cannot believe that it was
> the purpose of Congress to authorize litigants to
> submit their cases and controversies to arbitration
> boards that might reasonably be thought biased
> against one litigant and favorable to another.

Id. at 149-150.

Justice White concurred with the opinion of Justice Black, but clarified that the Supreme Court was not deciding whether "arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges." Id. at 150. Striking a balance, Justice White further explained,

> It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. . . . This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best informed and most capable potential arbitrators.

> The arbitration process functions best when an amicable and trusting atmosphere is preserved and there is voluntary compliance with the decree, without need for judicial enforcement. This end is best served by establishing an atmosphere of frankness at the outset, through disclosure by the arbitrator of any financial transactions which he has had or is negotiating with either of the parties. In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise. And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a

suspicious or disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.

Id. at 150-151 (White, J., concurring) (footnote omitted) (citations omitted).

Following the Supreme Court's decision in Commonwealth Coatings, the First Circuit has held that under Section 10(a)(2), "evident partiality" requires "more than just the appearance of possible bias." JCI Commc'ns, Inc. v. International Bhd. of Elec. Workers, Local 103, 324 F.3d 42, 51 (1st Cir. 2003).[4] "Rather, evident partiality means a situation

---

[4] The Court notes that although AEELA relies heavily on the Ninth Circuit's decision in Schmitz v. Zilveti, 20 F.3d 1043, 1048 (9th Cir. 1994), that has held that the "hairline distinction" between an "appearance of bias" and "reasonable impression of partiality" is unwarranted, it is not controlling in this Circuit, and has been described by the Fifth Circuit as

in which 'a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration.'" Id. (quoting Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621, 626 (6th Cir. 2002) and citing ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 500-501 (4th Cir. 1999); Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 84 (2d Cir. 1984); and Al Harbi v. Citibank, N.A., 85 F.3d 680, 683 (D.C. Cir. 1996)). This is "an objective assessment." United Steel Workers of Am., Local 12003 v. Keyspan Energy Delivery, No. CIV.A. 08-11928-GAO, 2009 WL 2422865, at *2 (D. Mass. Aug. 3, 2009) (O'Toole, J.).

The burden of establishing evident partiality rests upon AEELA. JCI Commc'ns, Inc., 324 F.3d at 51 (citations omitted). To meet this standard, "[a] party seeking to set aside an award on the basis of evident partiality 'must show that the alleged partiality is or was direct, definite, and capable of demonstration rather than remote, uncertain or speculative.'" Ameriprise Fin. Servs., Inc., 325 F. Supp. 3d at 225 (quoting United Steel Workers of Am., Local 12003, 2009 WL 2422865, at *2. "[I]t is not enough to identify some remote connection between the arbitrator and one of the parties; again, the

---

"an outlier." Positive Software Sols., Inc. v. New Century Mortg. Corp., 476 F.3d 278, 283 (5th Cir. 2007).

standard is whether 'a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration.'" ALS & Assocs., Inc. v. AGM Marine Constructors, Inc., 557 F. Supp. 2d 180, 183 (D. Mass. 2008) (Harrington, J.) (quoting JCI Commc'ns, Inc., 324 F.3d at 51). "[A] party seeking to vacate on this ground has a high burden of demonstrating objective facts inconsistent with impartiality." Rogers v. Ausdal Fin. Partners, Inc., 168 F. Supp. 3d 378, 389 (D. Mass. 2016) (Saylor, J.) (alteration in original) (citation and quotation omitted); see also ANR Coal Co., 173 F.3d at 501 (describing the "heavy burden" and "onerous standard").

Although the First Circuit has not yet decided the issue, an arbitrator's "alleged failure to investigate and timely disclose possible conflicts" does not, in and of itself, give "rise to a free standing basis for vacatur." ALS & Assocs., Inc., 557 F. Supp. 2d at 184. In fact, arbitration body disclosure rules do not control under the FAA. Id. "Thus, even if the arbitrator's compliance with these [disclosure] rules was imperfect . . . [such] missteps will not warrant vacatur unless they also fall within the one of the grounds set forth in the FAA." Id. Notably, "[t]he FAA . . . articulates no grounds for vacatur based on failure to investigate or disclose . . . and 'an arbitrator's failure to disclose, in and of itself, provides no basis to vacate an award.'" Id. (quoting ANR Coal, Inc., 173

F.3d at 495).  In sum, "[i]t is only when failure to investigate or disclose is linked to evident partiality that vacatur will be warranted."  Id.; see also Ploetz for Laudine L. Ploetz, 1985 Tr. v. Morgan Stanley Smith Barney LLC, 894 F.3d 894, 899-900 (8th Cir. 2018) (holding violation of FINRA Rule 12405 does not provide a basis for vacatur, but rather federal law establishes the standard).

The Circuits are split as to whether actual knowledge of a conflict, or potential conflict, is necessary.  Similar to the First Circuit in JCI Commc'ns, Inc., 324 F.3d at 51, the Eleventh Circuit starts with the proposition that "the mere appearance of bias or partiality is not enough to set aside an arbitration award."  Mendel v. Morgan Keegan & Co., Inc., 654 F. App'x 1001, 1003 (11th Cir. 2016) (unpublished opinion) (quoting Lifecare Int'l, Inc. v. CD Med., Inc., 68 F.3d 429, 433 (11th Cir. 1995)).  The Eleventh Circuit apparently takes a minority (but most objective) position that, "the evident partiality standard is satisfied 'only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists.'"  Id. at 1003 (emphasis added) (citing Gianelli Money Purchase Plan & Tr. v. ADM Inv'r Servs., Inc., 146 F.3d 1309, 1312 (11th Cir. 1998)).  Under this standard, "[t]he arbitrator must actually know of the potential

conflict -- failure to investigate for potential conflicts is insufficient to show evident partiality." Id. (citation omitted).

The Ninth Circuit, takes the opposite view. In New Regency Prods., Inc. v. Nippon Herald Films, 501 F.3d 1101, 1107 (9th Cir. 2007) it acknowledged its holding in Schmitz: "that an arbitrator's lack of actual knowledge of the presence of a conflict does not excuse non-disclosure where the arbitrator had a duty to investigate, and thus had constructive knowledge of, the conflict." (citation omitted). The Ninth Circuit observed the Eleventh Circuit's actual knowledge standard, and criticism of Schmitz, in Gianelli, but observed that "even if [it] were persuaded that Schmitz was wrongly decided, [the panel] would be bound to follow it as the law of our circuit." Id. at 1109. AEELA, of course urges the Court to follow the Ninth Circuit's view, that has been followed by the State of Alabama in Municipal Workers Comp. Fund, Inc. v. Morgan Keegan & Co., Inc., 190 So. 3d 895 (Ala. 2015).

In the context of nondisclosure, although the First Circuit has not fashioned a test, the Second Circuit and Fourth Circuit look to the following non-exclusive factors: "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged

to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding." Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 74 (2d Cir. 2012) (quoting Three S Del., Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 530 (4th Cir. 2007). With these standards in mind, the Court analyzed the arbitrators' alleged non-disclosures.

### a. Arbitrator Panel Chair Gerald Silverman

AEELA argues that Arbitrator Silverman demonstrated evident partiality under Section 10(a)(2) of the FAA when he failed to disclose that "he is a registered agent for a Panamanian investment society (Sociedad De Inversiones Leones S.A.) [(the "Panamanian Entity")]". AEELA Suppl. Br. 9. AEELA's only evidence is a 1985 agent registration form. Id.; Mot. Submitting Ex., Ex. R, Fla. Department of State Division of Corporations Report, ECF No. 80-18. AEELA contends that "by concealing his 31 year long relationship with a Panamanian investment entity, . . . Silverman failed to disclose material information to AEELA that he was required to provide pursuant to FINRA rules," and that "[h]ad Silverman properly disclosed this relationship with a Panamanian securities entity, AEELA would have requested additional information regarding the nature of the entities business and whether it associates itself with UBS

in any capacity." AEELA Suppl. Br. 9. AEELA argues that partiality may be shown by non-disclosure even if Silverman lacked awareness of the conflict, citing Schmitz, 20 F.3d 1043. Id. at 9-10.

The UBS Parties respond that AEELA's sole evidence of partiality is the registration statement, and that it offers no other evidence with respect to the Panamanian entity's business, how it might be connected to the UBS Parties (if at all), or whether Silverman had any contact with the entity since 1985. UBS Suppl. Br. 16.

The UBS Parties also point to other evidence, in particular, an email purportedly authored by Silverman initially denying knowledge of the issue, and a subsequent "on-the-record" statement in another arbitration matter in which he clarifies having no recollection of acting as an agent for the Panamanian Entity, and has had no contact with the Panamanian Entity since 1985:

> Yesterday, at 4:45, I received an email from FINRA concerning a case that I sat on about -- in May of this year. A lawsuit has been filed in Puerto Rico claiming that another arbitrator and I failed to disclose some information. Since that time, a request for relief from the arbitration award was filed in Puerto Rico. The request alleges that I did not reveal to the parties that I acted as an agent of an entity known as Sociedad of Investments Lenos, S.A. registered in Panama.
> Since yesterday at 4:45, I've done some discovery, and I have sent an email to FINRA, which I'm going to read to you. "Upon further research, I discovered that apparently in 1985, I signed a form designating me as

registered agent for [the Panamanian Entity].  I have no
recollection of the matter . . . . and I have had no
further contact [with the Panamanian Entity] whatsoever
in over 30 years.  The address listed with the Secretary
of State is an old address.  I moved my office in 1999.
I will notify the Secretary of State to remove my name
as registered agent.

UBS Suppl. Br., Ex. R, ECF No. 95-18 at 3-4, Uncertified Tr.

Marquez v. UBS Financial Services Incorporated of Puerto Rico,

Arbitration No. 13-03470 at 2-3.  AEELA does not respond to this

argument.  The UBS Parties argue that Schmitz is not the law of

this Circuit, and that the unintentional nondisclosure

"undercuts any claim of evident partiality."  Id. at 17 (citing

University Commons-Urbana, Ltd. v. Universal Constructors, Inc.,

304 F.3d 1331, 1341 (11th Cir. 2002); see United Steel Workers

of Am., Local 12003, 2009 WL 2422865, at *2 ("It is not possible

reasonably to think that [the arbitrator's] decision had been

influenced by a relationship she was unaware of.").  Notably,

AEELA does not respond to the UBS Parties' argument in its

Reply.

Even without Silverman's statement, which is persuasive on

its own, with nothing more than a thirty-year-old agency

registration statement and speculation, AEELA has failed to meet

its high burden by producing objective facts showing any

partiality at all, let alone that partiality "is or was direct,

definite, and capable of demonstration rather than remote,

uncertain or speculative."  Ameriprise Fin. Servs., Inc., 325 F.

Supp. 3d at 225 (citation omitted). AEELA's evidence is not compelling and does not support a finding that "a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration." JCI Commc'ns, Inc., 324 F.3d at 51 (citations omitted). It is the type of attenuated nondisclosure that is "too insubstantial to warrant vacating an award." Commonwealth Coatings, Corp., 393 U.S. at 152.

### b. Arbitrator Clement Osimetha

AEELA's claims with respect to Osimetha are a bit more complex, but fare no better. AEELA argues that arbitrator Osimetha failed to disclose:

(1) Osimetha's employment with Axiom Law ("Axiom") that provided legal services to UBS;

(2) Osimetha's UBS-administered retirement savings plan for DPT Laboratories;

(3) UBS ownership interest in Ciber, Inc. ("Ciber"), a publicly traded company at which Osimetha was Chief Compliance Officer, in which a UBS entity had institutional investments, and Invesco, Inc. ("Invesco"), a company in which a UBS entity had investments invested in Ciber; and

(4) Osimetha's employment with Capital One Bank.[5]

AEELA Suppl. Br. 3-8; AEELA Reply Suppl. Br. 1, 7-10. The UBS Parties counter on the merits that AEELA fails to meet its burden of proof. UBS Suppl. Br. 20. The UBS Parties also argue

---

[5] The Capitol One non-disclosure does not appear to be a primary argument. See AEELA Suppl. Br. 8.

that (1) even if Osimetha was somehow partial AEELA has made no
showing that it affected the other arbitrators, and (2) the
partiality arguments are waived because AEELA could have
detected and raised the non-disclosure issues during the
arbitration hearing.  UBS Suppl. Br. 17-24.  Addressing the
merits of the claims, AEELA fails to meet its high burden.
Because the Court decides the matters on the merits it need not,
and with the exception of waiver of the Axiom claim does not,
reach the remaining arguments.

### i.   **Axiom**

AEELA's best argument is that Osimetha's failure to disclose
that his now-former employer, Axiom -- which AEELA considers to
be a law firm -- provided legal services to UBS.  At the
inception of the arbitration Osimetha was employed by Axiom,
which AEELA claims is a law firm that provided legal services to
an affiliated entity of the UBS Parties.  AEELA Br. 4.  As
evidence, AEELA relies upon copies of a website page for Axiom
that listed UBS as a client and other periodicals that describe
UBS as a client.  Id. AEELA Supp. Br., Exs. C, D and E.
Osimetha listed Axiom as an employer on its disclosure forms, as
an "Attorney," but did not disclose Axiom's relationship with
UBS.  AEELA Suppl. Br. 5, Ex. G, ECF No. 80-7 at 1.  AEELA
claims that his nondisclosure is equivalent to concealment.  Id.
From August 2014 through April 2015, the first eight months

after his appointment to the arbitration panel, Osimetha worked

for Axiom, and did not disclose Axiom's purported "long standing

attorney-client relationship" with UBS. Id. 4-5. In the middle

of the arbitration hearings, Osimetha rejoined Axiom. Id.

According to AEELA, "Osimetha's curious decision to change

employers in the middle of [the arbitration], and in turn update

his disclosures, caused AEELA to investigate and discover a

series of relationships with UBS that . . . Osimetha failed to

disclose." Id. AEELA claims this is an actual conflict that

warrants vacatur of the arbitration award under Section

10(a)(2). Id. at 6.

UBS Parties counter that Axiom is not a law firm at all,

but rather "a temp agency with which Osimetha was affiliated

from April 2012 to April 2015 and again after April 2016." UBS

Suppl. Br. 22. The UBS Parties further explain that Axiom "is

not a law firm; it is a business that 'seconds' independent

attorneys to in-house legal departments." Id. The UBS Parties

cite Axiom's website disclaimer at https://www.axiomlaw.com/

disclaimer, which currently states:

> Axiom® is not a law firm and does not provide legal
> representation or advice to clients. Axiom attorneys
> are independent and do not constitute a law firm among
> themselves.

Id. (website last accessed 7/11/2019); UBS Suppl. Br. 22-23.

Further, the UBS Parties argue there is no evidence that

Osimetha ever worked for the UBS Parties, or that Axiom was working with the UBS Parties at the time of the arbitration. Id. at 23. According to the UBS Parties, their own investigation has since identified only one engagement in the United States with Axiom that predated the arbitration concerning "swap agreements unconnected with any aspect" of the dispute at issue in the arbitration. Id. The UBS Parties also point out that there is no evidence that Osimetha knew of the relationship between UBS and Axiom. Id.

AEELA counters in its Reply that the UBS Parties "admit" that Axiom provided legal services to them, AEELA Reply Suppl. Br. 1, and the disclosure of a different arbitrator, Natasha Bell, another employee of Axiom that states, as of February 2018, "Axiom is a legal staffing agency that provides services to UBS Financial Services, Inc." AEELA Reply Suppl. Br. 1, & Ex. B. More importantly, AEELA points out that Osimetha has amended his disclosure report as of January 25, 2019, to include a statement that "Axiom provided legal services to financial industry clients." AEELA Reply Suppl. Br. 1 & n.1.

The UBS Parties narrowly have the better argument. First, AEELA's argument rests upon the assertion that Axiom is a law firm that employed Osimetha as an attorney while providing legal services to the UBS Parties or their affiliates. If AEELA had demonstrated that Axiom is a traditional law firm, then its

argument might have more merit.  The record reflects, however, that Axiom appears to be neither a traditional law firm as argued by AEELA, nor a traditional temporary staffing agency as argued by the UBS Parties.[6]  Accordingly, to the extent that AEELA claims an actual conflict exists on the grounds that Osimetha is a lawyer employed by Axiom as a law firm, those arguments fail, at least on this record.  Even were Axiom to be viewed as a law firm, the relationship between Axiom and Osimetha is too attenuated where the relationship is ill-defined.  See Lifecare Int'l, Inc., 68 F.3d at 434 (holding that

---

[6] Axiom's legal status is an enigma that raises more conflict questions than answers for practitioners (and arbitrators).  See John S. Dzienkowski, The Future of Big Law: Alternative Legal Service Providers to Corporate Clients, 82 Fordham L. Rev. 2995, 3008 (2014)("Axiom Law is not a law firm, but it is a consulting company that helps corporate clients determine how to best structure their legal affairs.  Axiom Law employs lawyers and in fact outsources and insources lawyers to clients.  Does Axiom Law follow any rules of professional responsibility? Could it simultaneously advise two competitors on how to staff an entry into a particular market?  Could the same lawyers be outsourced or insourced to corporations that are in competition with each other in the same marketplace?  The public information of Axiom Law does not directly address these questions.  However, Axiom does have a 'Code of Conduct, Ethics & Compliance Policy' that touches upon general concepts of duties toward clients."); Stephen Gillers, A Profession, If You Can Keep It: How Information Technology and Fading Borders Are Reshaping the Law Marketplace and What We Should Do About It, 63 Hastings L.J. 953, 987–88 (2012) ("To an outsider, Axiom looks like a law firm, and it does not seek to dispel that impression . . . . And by virtue of the temporary agency ethics opinions, its lawyers are able to form and disband teams unencumbered by the conflict rules that can hamper movement of traditional lawyers.").

an arbitrator who was of-counsel to firm limited representation of a party in arbitration years before arbitration was not evident partiality where representation on one contract review pre-dated arbitration and arbitrator unaware of contacts even though inquiry would have revealed conflict), opinion modified and supplemented, 85 F.3d 519 (11th Cir. 1996).

Second, even if Axiom is viewed merely as an employer of Osimetha, AEELA's claim still fails. While there is some evidence that Axiom provided, at some point, some sort of legal services to UBS, AEELA's evidence simply does not provide sufficient evidence of the timing and extent of such services.

Third, there is no evidence or allegation that Osimetha personally provided any services or legal advice to UBS, or had any knowledge of any relationship between Axiom and any affiliate of the UBS Parties.[7] Indeed, AEELA merely speculates about Osimetha's knowledge and motives.

---

[7] The First Circuit has not decided whether an arbitrator's failure to investigate potential conflicts when under a duty to do so under arbitral fora rules itself creates a reasonable impression of partiality even without actual knowledge of the facts. The Ninth Circuit and Eleventh Circuit take diametrically opposing views. Compare Schmitz, 20 F.3d at 1049 with Mendel, 654 F. App'x at 1003. While there is merit to both arguments, the Court views the lack of evidence of actual knowledge of the arbitrator as something that, while perhaps not conclusive, ought be considered in this fact-intensive calculus as to vacatur.

Finally, other than AEELA's wholly speculative assertion that Osimetha wanted to increase his likelihood of appearing on the panel, AEELA Reply Suppl. Br. 7-8, there is no evidence of any intent by Osimetha to "conceal" anything. Based upon the limited record, and focusing on AEELA's high burden, the Court is not persuaded that the Axiom's relationship with the UBS Parties "might create an impression of possible bias." Commonwealth Coatings Corp., 393 U.S. at 148-149. On this record, the Court concludes that there is an absence of evidence of Osimetha having a "substantial interest" in Axiom, and that Osmietha's relationship with the UBS Parties via Axiom is unknown or at best "trivial," and an "undisclosed relationship[] which [is] too insubstantial to warrant vacating an award." Id. at 151-152 (White, J., concurring). As such, AEELA has not supported its claim with sufficient evidence to support a ruling that "a reasonable person would have to conclude that [Osimetha] was partial to one party to an arbitration." JCI Commc'ns, Inc., 324 F.3d at 51 (citations omitted).

Alternatively, AEELA has waived claims relating to Axiom. Too often arbitration results in a post-arbitration litigation about the arbitration, with disappointed parties attempting to inappropriately squeeze through the narrow avenues for vacatur, often referred to as "sore loser" challenges. See B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 907 (11th Cir.

[26]

2006) ("The laudatory goals of the FAA will be achieved only to the extent that courts ensure arbitration is an alternative to litigation, not an additional layer in a protracted contest.  If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less."), abrogated on other grounds by CM South East Texas Houston, LLC v. CareMinders Home Care, Inc., 662 Fed. Appx. 701, 706 (11th Cir. 2016).  When Congress enacted the FAA in 1925, it almost certainly did not have in mind a world where a dissatisfied party could launch a relatively inexpensive post-arbitration investigation of an arbitrator's background by an internet search engine query.  Where the stakes are high, even sophisticated parties and their experienced counsel (perhaps in the name of zealous advocacy) seem unable to resist "the Siren's call lure . . . to the shoals of litigation" after losing on the merits at arbitration.  See Dozier v. Chupka, 763 F. Supp. 1430, 1433 (S.D. Ohio 1991).

Courts, of course, have not been receptive to "sore-loser" challenges in post-award, non-disclosure cases.  See e.g., Goldman, Sachs & Co. v. Athena Venture Partners, L.P., 803 F.3d 144, 148 (3d Cir. 2015) ("[W]here a party is capable of 'thoroughly and systematically digging for dirt on each of the

three arbitrators,' it should do so prior to being solely motivated by the chance of vacating the award.") (quoting Stone v. Bear, Stearns & Co. Inc., 872 F. Supp. 2d 435, 440 (E.D. Pa. 2012), judgment entered, No. 2:11-CV-5118, 2012 WL 1946970 (E.D. Pa. May 29, 2012), and aff'd, 538 Fed. Appx. 169 (3d Cir. 2013)) (citing Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 683 (7th Cir. 1983) ("It is true that the disclosure requirements are intended in part to avoid the costs of background investigations. But this is a $10 million case. If [the plaintiff] had been worried about putting its fate into the hands of someone who might be linked in the distant past to the adversary's principal, it would have done more than it did to find out about [the arbitrator]. That it did so little suggests that its fear of a prejudiced panel is a tactical response to having lost the arbitration.")). Indeed, as the First Circuit has held, the Court "cannot accept that parties have a right to keep two strings to their bow -- to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before claimed." JCI Commc'ns, Inc., 324 F.3d at 52 (quoting Early v. Eastern Transfer, 699 F.2d 552, 558 (1st Cir. 1983)).

AEELA's challenge to the arbitration award in this action, particularly with respect to AEELA's claims with respect to Axiom bear the hallmarks of a post-award challenge motivated by

loss at arbitration.  Here, it is apparent that AEELA only undertook its investigation concerning Axiom after the adverse award.  Indeed, as in Stone, "even assuming the circumstances warranted vacatur," with respect to Axiom (which they do not here), AEELA "cannot rightfully contest the award based on [its] newly-discovered evidence because [it] failed to investigate the arbitrators as diligently before the arbitration as [it] did after [it] lost." Stone, 872 F. Supp. 2d at 454 (emphasis in original).  With respect to Axiom, a simple internet search apparently would have revealed the purported UBS Parties' relationship with that entity.

The Stone decision, cited by the UBS Parties, is instructive and persuasive.  In that case, Laurence Stone, a Pennsylvania businessman filed a $7,600,000 FINRA arbitration claim against Bear, Stearns & Co., Inc. for losses incurred in a hedge fund investment gone bad. Id. at 439.  The parties selected arbitrators similar to the process in the underlying arbitration action. Id.  "Stone relied on his attorneys to conduct due diligence on the arbitration panel candidates." Id. at 440.  Stone's attorney reported that "he and his colleagues investigated the potential arbitrators by doing internet research, looking at their prior FINRA arbitration awards, and reviewing their [arbitrator disclosure reports]." Id.

One of the arbitrators disclosed that her husband was a professor at the University of Pennsylvania, but failed to disclose his ties to the securities industry. Id. The arbitrator had disclosed the relationship to FINRA on at least two occasions, but FINRA only revealed the disclosure that the arbitrator's husband was a professor. Id. at 441-442. The arbitrator failed to correct the error, even though she could have at the beginning of each hearing. Id. The arbitrator also sat on the board of W.P. Carey, and was later elected to their investment committee during the arbitration and the board of Carey Asset Management. Id. Carey Asset Management, unbeknownst to the arbitrator apparently because of its "complicated organizational structure", owned a registered broker dealer. Id.

Stone lost the arbitration in a unanimous decision. Id. at 442. Even though Stone admitted that he could have done the research earlier, he only then began scouring the internet for information, revealing the above undisclosed facts, primarily by Google searches on the internet. Id.

The court denied the petition to vacate the award and allowed the cross-petition to confirm the award, holding that a constructive knowledge standard ought apply. Stone, 872 F. Supp. 2d at 455 (citing JCI Commc'ns, Inc., 324 F.3d at 52). In applying it, the court explained Stone's waiver:

Under this standard, Stone undoubtedly waived his "evident partiality," "misbehavior," and "exceeding powers" challenges to the arbitration award at issue here. All three challenges stem from the allegedly non-disclosed information about [the arbitrator] that Stone discovered in his belated, post-award investigation. By his own admission, Stone could have done this research earlier in the process but did not. Instead, Stone waited until he lost and then almost immediately began scouring the internet for anything that might suggest one arbitrator or another was biased against him. Stone spent approximately twenty (20) hours on this task, researching not one, but all three arbitrators looking for evidence of partiality. This is exactly the kind of undesirable strategic behavior that the waiver doctrine is designed to prevent . . . .

However, even assuming Stone's attorneys' investigatory efforts inure to Stone's benefit for the purposes of waiver, we see nothing in the record to indicate that Stone (either himself or through his attorneys) researched the arbitrators nearly as thoroughly before the arbitration as he did after he lost. Under these circumstances, we think waiver is appropriate. The Second Circuit would agree. *See Lucent,* 379 F.3d at 28 (remarking that the Second Circuit has "declined to vacate awards because of undisclosed relationships where the complaining party should have known of the relationship ... or could have learned of the relationship just as easily before or during the arbitration rather than after it lost its case." ) (citations and internal quotations omitted) (emphasis added).

This requirement places no undue burden on the parties to an arbitration. To preserve failure-to-disclose-type challenges to an arbitration award, the parties simply need to exercise as much diligence and tenacity in ferreting out potential conflicts ex ante (in selecting the panel) as they do ex post (once attacking the award becomes the sole reason to research the arbitrators). Anything less would allow, if not encourage, sore losers to do exactly what Stone did in this case: run a post-award background check on each and every arbitrator, not because he perceived any bias during the arbitration, but simply as a tactical response to losing.

<u>Stone</u>, 872 F. Supp. 2d at 456-57. AEELA does not analyze <u>Stone</u>, but rather counters that it is under no duty to investigate the arbitrators in order to verify the disclosures were accurate. AEELA Reply Suppl. Br. 2. AEELA first cites to <u>Field</u> v. <u>Mans</u>, 516 U.S. 59 (1995), a Supreme Court case involving a discussion of reasonable reliance in the context of statutory interpretation of the Bankruptcy Code. AEELA, with no pinpoint citation, also relies on the unpublished decision of <u>Applied Indus. Materials Corp.</u> v. <u>Ovalar Makine Ticaret Ve Sanayi, A.S.</u>, No. 05 CV 10540(RPP), 2006 WL 1816383, at *8 (S.D.N.Y. June 28, 2006), <u>aff'd</u>, 492 F.3d 132 (2d Cir. 2007), for the proposition that it was under no duty to independently investigate each prospective arbitrator and that it was reasonable for it rely upon the disclosures. The district court decision was affirmed by the Second Circuit which held that "when an arbitrator <u>knows</u> of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality." <u>Applied Indus. Materials Corp.</u> v. <u>Ovalar Makine Ticaret Ve Sanayi, A.S.</u>, 492 F.3d 132, 138 (2d Cir. 2007) (emphasis added). These cases are not controlling precedent in the First Circuit.

The reasoning in <u>Stone</u>, while not controlling, is persuasive here. Here, AEELA could have learned of the

purported Axiom non-disclosure with a click of the mouse after the updated disclosure. Stone, 872 F. Supp. 2d at 456-57 see also Konz v. Morgan Stanley Smith Barney, LLC, No. 18 CIV. 5181 (GBD), 2018 WL 5818108, at *4 (S.D.N.Y. Oct. 17, 2018), appeal dismissed (Dec. 26, 2018) (ruling objecting party waived claim where party could have learned of arbitrator's failure to disclose employment change that would have disqualified arbitrator as a public arbitrator). What changed between the disclosures and the post-award investigation? AEELA lost the arbitration. Accordingly, in the alternative, AEELA waived its claims with respect to Axiom.

### ii. DPT Laboratories – UBS Broker/Agent for Retirement Plan.

AEELA claims that although Osimetha disclosed DPT Laboratories ("DPT") in his disclosures, he "failed to disclose that UBS was the broker and/or agent for . . . [DPT's] . . . retirement savings and profit-sharing plan." AEELA Suppl. Br. 6. AEELA claims that DPT had over 1400 plan participants, including Osimetha, with over $65,100,000 in plan assets. Id. AEELA claims this was an investment account that should have been disclosed under FINRA rules. Id. UBS correctly counters that there is no evidence that Osimetha was a member of this plan. UBS Br. 22. The UBS Parties also counter that AEELA's evidence demonstrates that the UBS Parties were not a broker or

agent of the retirement plan itself, but rather represents that its affiliate merely earned commissions in locating an insurance carrier for the Plan. UBS Suppl. Br. 22 (citing AEELA Suppl. Br. 6-7, & Exs. I and J). Notably, AEELA does not respond to the UBS Parties' position in its Reply brief as to DPT. AEELA has failed to support this argument with sufficient evidence to support a ruling that "a reasonable person would have to conclude that [Osimetha] was partial to one party to an arbitration." JCI Commc'ns, Inc., 324 F.3d at 51.

### iii. Ciber, Inc. and Invesco, Inc.

During the arbitration, on September 15, 2015, Osimetha disclosed that he had accepted a position at Ciber, Inc. ("Ciber"), a publicly traded company, as its Chief Compliance Officer. AEELA Suppl. Br. 7. According to AEELA, Osimetha would have known, or should have known, about the shares owned by Invesco, Inc. ("Invesco"), a UBS affiliate and Ciber's largest shareholder, a company in which UBS had a "substantial investment." Id. Invesco was a third-party investor company to which UBS had referred AEELA to during their relationship. Id. at 8. UBS owned a "significant portion" of Ciber. Id. at 7. AEELA relies on a biography obtained from a website describing Osimetha's duties as chairman of the company's compliance committee who would or should have known of UBS' ownership interest in Ciber's stock. AEELA Suppl. Br. 7.

The UBS Parties counter that the total amount of the ownership by UBS was 1/4000[th] of Ciber, and 9.3% of Invesco. UBS Suppl. Br. 20. The total investment is less than 0.5% of Ciber, and other than speculating, AEELA has offered no evidence of the nature of the investment. UBS Suppl. Br. 20-21. Importantly, there is apparently no evidence of UBS's holdings in Ciber before and during the arbitration. Id. n.11. The UBS Parties also claim there is insufficient evidence submitted in support of the total amount of shares held by UBS Parties in Invesco. UBS Suppl. Br. 21. This does not appear to be a situation as in Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir. 1995), where the arbitrator failed to disclose he was vice president, Chief Financial Officer and compliance officer with an employer that did significant business with a party. Indeed, there is no evidence that Osimetha was aware of the investments at all. Therefore, it is too attenuated to compel a ruling that "a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration." JCI Commc'ns, Inc., 324 F.3d at 51.

### iv. Capital One Bank

AEELA argues that Osimetha failed to disclose his employment by Capital One as evidenced by a 2016 Business Week biography of Osimetha. AEELA Suppl. Br. 8. While initially, Osimetha did not disclose Capital One by name, the UBS Parties

respond that Osimetha disclosed his work for Capital One in the
September 15, 2015 updated disclosure.  UBS Suppl. Br 24 n.16.
While AEELA posits that perhaps UBS Parties had an interest in
Capital One, its argument is not supported by any evidence.
AEELA Suppl. Br. 7.  Absent sufficient argument or evidence,
AEELA fails to meet its burden and AEELA's submissions do not
compel a finding that "a reasonable person would have to
conclude that an arbitrator was partial to one party to an
arbitration."  JCI Commc'ns, Inc., 324 F.3d at 51.

### 3.  Arbitrator Misconduct/Misbehavior.

AEELA's attempt to repackage its evident partiality
arguments as arbitrator misbehavior under Section 10(a)(3) of
the FAA is unpersuasive.  "Section 10(a)(3) of the FAA lists
three separate grounds for vacatur: . . . '[w]here the
arbitrators were guilty of misconduct in refusing to postpone
the hearing, upon sufficient cause shown, or in refusing to hear
evidence pertinent and material to the controversy; or of any
other misbehavior by which the rights of any party have been
prejudiced.'"  National Cas. Co. v. First State Ins. Grp., 430
F.3d 492, 497 (1st Cir. 2005) (alteration in original) (quoting
9 U.S.C. § 10(a)(3)).  AEELA presses only the third ground.

While "in theory, [there is no reason] why 'misbehavior'
would categorically exclude instances of non-disclosure . . . in
practice failure-to-disclose that would constitute 'misbehavior'

[36]

under Section 10(a)(3) would likely also reflect 'evident partiality,' which Section 10(a)(2) already addresses.'" Stone, 872 F. Supp. 2d at 449 (citing STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011) (noting the relative novelty of the legal theory that insufficient disclosure under Section 10(a)(3) instead of Section 10(a)(2))).

Here, AEELA claims that Silverman's and Osimetha's failures to disclose that formed its basis of vacatur under evident partiality alternatively constitute misbehavior.  AEELA Suppl. Br. 15-16.  AEELA claims that during the selection process it would have struck Silverman and Osimetha from the panel had they been provided the undisclosed information.  Id. at 17.  "Had AEELA been made aware of these facts at any time before the issuance of the Award, it would have sought to replace Osimetha and Silverman with qualified and unbiased arbitrators."  Id. at 17.  AEELA contends that could not have happened because Silverman and Osimetha "concealed material information from their disclosures."  Id.

AEELA relies on Goldman, Sachs & Co. v. Athena Venture Partners, L.P., No. 13-MC-130, 2013 WL 3955136, at *8 (E.D. Pa. Aug. 1, 2013), rev'd and remanded, 803 F.3d 144 (3d Cir. 2015), for the proposition that parties are entitled to truthful

disclosures to obtain a contracted-for unbiased panel at

arbitration. AEELA Suppl. Br. In Goldman, the court held:

> We would be inclined to agree with the Applicants'
> argument that, by failing to object or request [the
> arbitrator's] removal following the issuance of his
> updated disclosure in March, 2012, Respondents waived
> their right to now challenge the panel's award, were it
> not for the fact that it was so grossly misleading and
> incomplete. But the FINRA rules clearly entitled the
> Respondent to a panel composed of at least three
> qualified arbitrators (unless they agreed to proceed
> with two) and to have those arbitrators answer
> truthfully the questions posed to them in the required
> disclosures checklists. Indeed, it is only in reviewing
> those complete and honest answers that potential
> conflicts, bias and interests can be truly assessed and
> the integrity of the arbitral process ensured. Again,
> courts properly enforce the bargains implicit in
> agreements to arbitrate by enforcing arbitration awards
> only in the absence of a reason to doubt the authority
> or integrity of the arbitral forum . . . Here, in
> failing to provide these parties with three qualified
> arbitrators, FINRA failed to provide what the parties
> agreed to in the Subscription Agreement.

Goldman, Sachs & Co., 2013 WL 3955136, at *8. That court

vacated the arbitration award under Section 10(a)(3). Id.

AEELA also relies on Move, Inc. v. Citigroup Global Markets,

Inc., 840 F.3d 1152, 1158 (9th Cir. 2016), in which the Ninth

Circuit held the fact that an arbitrator that lied about his

status as an attorney in his disclosures deprived a party to a

fundamentally fair hearing:

> Because Move and Citigroup agreed to arbitrate their
> multi-million dollar dispute before a panel of three
> qualified arbitrators as provided by FINRA's rules and
> regulations, the parties' rights to such a proceeding
> were prejudiced by the inclusion of an arbitrator as

[38]

chairperson who should have been disqualified from arbitrating the dispute in the first place.

Move, Inc., 840 F.3d at 1159. The UBS Parties argue that Move, Inc. is distinguishable because it was affirmative misrepresentation case, not a non-disclosure case. UBS Suppl. Br. 24 n.18.

The UBS Parties argue Section 10(a)(2) cases for the proposition that a non-disclosure failure is not misbehavior under Section 10(a)(3). Id. at 24-25 (citing ALS & Assocs., Inc., 557 F. Supp. 2d at 184; Nationwide Mut. Ins. Co. v. First State Ins. Co., 213 F. Supp. 2d 10, 17 (D. Mass. 2002) (O'Toole, J.); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 680 (7th Cir. 1983)). The UBS Parties further argue that even if a stand-alone failure to disclose could constitute "misbehavior," AEELA has not attempted to show the arbitration hearing was unfair or that there was prejudice. UBS Suppl. Br. 25 (citing Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.), Inc., 846 F. Supp 2d 298, 304 (D. Me. 2012), aff'd, 695 F.3d 181 (1st Cir. 2012)).

Although ALEEA makes much of FINRA's disclosure regulations, the Eighth Circuit has recently held that "arbitrator misbehavior that results only in the violation of a party's rights under a FINRA Rule is not significant enough to merit relief under § 10(a)(3)." Ploetz for Laudine L. Ploetz,

1985 Tr., 894 F.3d at 900. In that case, the Eight Circuit

held:

> [Petitioner] seeks finally to vacate the award on the
> basis that [the arbitrator] was guilty of "misbehavior
> by which [her] rights . . . have been prejudiced." See
> 9 U.S.C. § 10(a)(3). She asserts she warrants relief
> since [the arbitrator's] failure to disclose his past
> service as a mediator in . . . [another] . . . case
> prejudiced her disclosure "rights" under the FINRA
> Rules. But arbitrator misbehavior that results only in
> the violation of a party's rights under a FINRA Rule is
> not significant enough to merit relief under § 10(a)(3).
> Instead, a party seeking to vacate an award "under §
> 10(a)(3) must show that he was 'deprived of a fair
> hearing.'" See Brown [v. Brown-Thill, 762 F.3d [814,]
> 820 (8th Cir. 2014). [Petitioner], however, does not
> contend the arbitration was not fair: When asked at oral
> argument whether there were any irregularities in the
> arbitral hearings themselves, she said she had not
> alleged any. So the district court correctly denied her
> relief under § 10(a)(3) as well.

Id.; see also Stone, 872 F. Supp. 2d at 450 (describing the

"extremely high bar for vacatur" under Section 10(a)(3) in a

non-disclosure case). Indeed, prejudice is "a requirement for

vacating an [arbitration] award under [S]ection 10(a)(3)."

Bangor Gas Co., LLC v. H.Q. Energy Services (U.S.) Inc., 695

F.3d 181, 192 (1st Cir. 2012).

Focusing on the "prejudice" requirement under Section

10(a)(3), AEELA claims a lack of a fundamentally fair hearing

because it did not get the arbitration panel for which it

contracted. AEELA Suppl. Br. 17. The UBS Parties focus on

prejudice with respect to the hearing itself, providing

transcript portions where, among other things, AEELA's counsel

[40]

complimented the panel at the close of the hearing. UBS Suppl. Br. at 25, Ex. B, hearing transcript. The UBS Parties, again, have the better argument. While Osimetha and Silverman perhaps made imperfect disclosures, AEELA has not met its burden that it suffered any prejudice at the hearing itself as a result of misconduct of the arbitrators.

### B. Remaining Motions

Because AEELA's Vacatur Action has been decided on the merits, the motion for judgment on the pleadings is denied as moot. Additionally, the relief sought in the Motion for Relief from Judgment has been provided in the Vacatur Action, namely a decision on the merits of the allegations of arbitrator partiality and misconduct in the arbitration. Accordingly, where there is no basis to disturb the confirmation of the award on the merits, that motion is denied.

### IV. ARBITRATION WITHOUT ILLUSIONS[8]

Arbitration is to justice as a metronome is to a Stradivarius. But what of it? So long as it is quick, cheap, and private, big business will go for it, especially since, when deployed against a lone consumer, it effectively bars the little

---

[8] I am indebted to my colleague and friend, Brock Hornby for the title of this section. It comes from his superb essay, Summary Judgment without Illusions. D. Brock Hornby, Summary Judgment without Illusions, 13 Green Bag 2d 273 (2010). The views herein are solely my own.

guy from the courts of justice and the constitutional guarantee of a jury of his peers. This was forced arbitration in the financial services sector; that type of mandatory arbitration that the Consumer Finance Protection Bureau has so thoroughly studied, analyzed, and excoriated. Consumer Finance Protection Bureau, Arbitration Study, Report to Congress, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection act § 1028(a) (March 2015) (studying consumer financial services arbitration clauses, but not securities arbitration). Oblivious to these well-documented conclusions, UBS continues to use arbitration to shield itself from the complaints of its most vulnerable consumers. See Mendez-Campoamor v. UBS Financial Services of Puerto Rico, Inc., Civ No. 3:18-cv-01656-WGY, October 23, 2019 Order, ECF No. 43 (ordering consumer plaintiffs to arbitration with UBS Financial Services of Puerto Rico, Inc.).

What's different in this case is that AEELA is far from a vulnerable consumer. Like most arbitration proceedings, the parties have kept their dispute private -- a choice this Court respects in this opinion. As the arbitration involved a three-arbitrator panel, its cost rivalled that of federal court litigation. See CellInfo, LLC v. Am. Tower Corp., 352 F. Supp. 3d 127, 136 (D. Mass. 2018) (discussing the fallacy of the premise that arbitration is cheaper).

Start to finish, this arbitration took 25 months, slow even

by federal court standards.  See June 2019 Federal Court

Management Statistics-Comparison within Circuit,

https://www.uscourts.gov/statistics-reports/federal-court-

management-statistics-june-2019 (last visited November 21, 2019)

(describing median time from filing to disposition in the

District of Puerto Rico is 18.4 months).  Next came the efforts

to confirm and vacate the arbitration award in this Court.

Forty-one months later the Court entered its order and now, two

months after that, the Court has finally explained itself.  What

happened?

In The Secret Life of Judges, 75 Fordham L. Rev. 2855

(2007), the Hon. Dennis Jacobs brilliantly explains how

different professions, including judges, implicitly ascribe

value to those particular attributes they bring to society.

Different professions, of course, tend to highlight different

values.

Judges value strict impartiality, and freedom from

conflicts of interest.  So it is that Justice Black, writing for

the plurality in Commonwealth Coatings, reasoned that, as

arbitrators are like judges, they ought be held to an

approximation of the standards to which judges are held.

Moreover, judges value written opinions.  Hon. Robert C. Keeton,

Keeton, Judging in the American Legal System 1 (Lexis Law

Publishing 1999) ("At its best, judicial choice is reasoned choice, candidly explained").  Written opinions take time -- quite a bit of time -- to prepare.  See D. Brock Hornsby, Summary Judgment without Illusion, 13 Green Bag 2d at 278 ("[A majority] of lawyers report federal judges routinely do not rule promptly on summary judgment motions" and suggesting that the exhortation of written opinions may be the reason); but see Institute for Advancement of the American Legal System, Civil Case Processing in the Federal District Courts (2009) ("It . . . does not appear that time dedicated to writing opinions necessarily impacts a court's efficiency -- the fasted court also published the most opinions per judge.").

So here, when AEELA raised the specter of partiality and conflicts of interest,[9] this Court took the time to afford multiple oral hearings, scrupulously analyzed the various contentions and wrote it all up.  This course is in keeping with this Court's traditional approach to jury waived adjudication. See Sotheby's Int'l Realty, Inc. v. Relocation Grp., LLC, 987 F. Supp. 2d 157, 159 (D. Conn. 2013) (15 months to vacating arbitration award), rev'd, 588 Fed. Appx. 64 (2d Cir. 2015) (an additional 13 months before original award reinstated); 16th St.

---

[9] These are issues of continuing concern in arbitration, issues that far transcend this case.  See Caroline Simson, Institutions Eagerly Awaiting Guidance on Arbitrator Bias, Law 360 (Nov. 25, 2019).

_Invs., LLC_ v. _KTJ 216, LLC_, No. CV31700174WGYARS, 2018 WL
1612189, at *1 (D. N.D. Apr. 3, 2018) (12 months to confirm
arbitration award).

It occurs to me that I am handling these arbitration
confirmation proceedings all wrong -- and in doing so I'm
diluting the genuine promise of arbitration: the quick, cheap,
and private resolution of disputes so the business of business
can move on. In short, I am too slow -- valuing the judicial
goals of justice and carefully reasoned analysis over speed.

There is nothing surprising about this. This is what
judges contribute to society. Indeed, judges are the guardians
of humanity's most audacious attempt to achieve true justice --
the American jury trial: the purest, fairest, most inclusive and
robust expression of direct democracy the world has ever seen.

The trouble is in our constant attempts to make the run up
to trial ever more just, we've rendered the whole process so
ponderous and expensive in federal court that only the elite can
ever get to trial. Face it, we've priced ourselves out of the
market.

Against this reality, a quick, cheap, and private dispute
resolution system looks pretty good. An arbitration award that
simply sets the clock running on federal litigation is no system
at all. Let's talk straight: judges see justice before anything
else -- and they should. A prime example was Judge J. Waties

Waring, District of South Carolina, "While on the bench I developed a passion for justice." See Hon. Richard Gergel, <u>Unexampled Courage: The Blinding of Sgt. Isaac Woodward and the Awakening of President Harry S. Truman and Judge J. Waties Waring</u>, Sarah Crichton Books, 2019.

Arbitrators are interested in justice too; they certainly try to be fair. But arbitrators are not judges; they are not even like judges and it is a fallacy to think that they are. They have neither tenure nor job security. They are people paid by the parties. Most are part time, drawn from many learned professions (and the continuing incessant demands of those professions). Their awards, especially in the context of securities arbitration awards -- rarely supported by reasoned decisions -- add nothing to the development of the law in the traditional sense, Jean R. Sternlight, <u>Creeping Mandatory Arbitration: Is It Just?</u>, 57 Stan. L. Rev. 1631, 1661 (2005) ("Even if it could be shown that mandatory arbitration were beneficial for many or potentially all consumers and employees who had claims, some argue it would still be detrimental to society in that it curtails the use of public (sometimes jury) trials and eliminates the development of public precedent."); indeed, even if they get the law wrong it makes no difference and they know it. See <u>Ortiz-Espinosa</u> v. <u>BBVA Sec. of Puerto Rico, Inc.</u>, 852 F.3d 36, 48 (1st Cir. 2017). Moreover, the bias

of arbitrators in favor of repeat players like banks who may hire them again is well-documented. Surely, those who voluntarily choose arbitration today know what they are getting.[10] But see *CellInfo, LLC*, 352 F. Supp. 3d at 136-37 (pointing out that arbitration today frequently is expensive and slower than federal litigation).

Therefore, to fulfill the genuine promise of arbitration I'll have to step up my game. In the future, while faithfully applying applicable law, I'll try to resolve every confirmation or vacation motion within 30-60 days of filing. This means that generally there'll be no continuances, no oral hearings, and no written opinions (none are required). Quick, cheap, and private are arbitration's true imperatives.

## V. CONCLUSION

AEELA has not met its high burden of demonstrating arbitrator evident partiality or misbehavior under Section 10(a) of the FAA. Accordingly, AEELA's Motion to Vacate the Arbitration Award (Confirmation Action, ECF No. 79-1, Confirmation Action and Vacatur Action, 18-1) was **DENIED** on the merits and Judgment shall enter in favor of the UBS Parties in

---

[10] Of course, this is what makes forced or mandatory arbitration so unconscionable; millions are forced into it without understanding that it effectively bars them from the courts their taxes are supporting and juries of their fellow citizens.

the Vacatur Action.  UBS Parties' Motion for Judgment on the

Pleadings (Vacatur Action, ECF No. 41) was <u>DENIED</u> as <u>MOOT</u>.

AEELA's Motion for Relief from Judgment (Confirmation Action,

ECF No. 48) was <u>DENIED</u>.

WILLIAM G. YOUNG
DISTRICT JUDGE